STATE of Wisconsin, Plaintiff-Respondent,

v.

DARCY N. K., Defendant-Appellant.†

Court of Appeals

*No. 97–0458–CR. Submitted on briefs February 11, 1998.—Decided April 16, 1998.*

(Also reported in 581 N.W.2d 567.)

†Petition to review denied.

641

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kenneth L. Lund,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

Before Dykman, P.J., Roggensack and Deininger, JJ.

DEININGER, J. A jury found Darcy K. guilty of three counts of first-degree sexual assault of a child, in violation of § 948.02(1), STATS. He appeals the judgment of conviction and an order denying his motion for postconviction relief. Darcy K. claims the trial court erred: (1) by conducting an in camera inspection of the victim's psychiatric records without the victim's consent, by refusing to disclose more of the records than it did, and by failing to order that additional records be submitted for in camera review; and (2) by permitting jurors to ask questions of witnesses during the trial without adequate procedural safeguards. He also argues that his trial counsel was ineffective for failing to object to the juror questioning procedure and for failing to make an offer of proof when he was denied the opportunity to ask follow-up questions. Finally, Darcy K. asks that we exercise our discretionary authority to order a new trial in the interests of justice.

We conclude that Darcy K. may not challenge on appeal an in camera review of records conducted at his own request, the trial court did not erroneously exer-

cise its discretion in releasing only the information it did, and Darcy K. made an insufficient showing to require additional records to be submitted for review. We also conclude that Darcy K. forfeited his right to claim error in the trial court's allowance of questions from jurors, and in the method by which the questioning was accomplished, because he did not object to the procedure, or to any specific questions, in the trial court. While we agree with the parties that, when a trial court allows questioning of witnesses by jurors, it should employ the procedural safeguards set forth in WIS J I—CRIMINAL SM–8, we conclude that the trial court's failure to do so in this case did not prejudice the defendant. Accordingly, we reject Darcy K.'s claim of ineffective assistance of counsel and decline to exercise our discretionary authority to order a new trial.

## BACKGROUND

Darcy K.'s stepdaughter, M.F., testified at trial that Darcy K. had assaulted her on three separate occasions in 1992, when she was twelve years old, twice by licking her vagina and once by inserting his finger into her vagina. Prior to trial, Darcy K. moved for an in camera inspection of "all the items of information located in the alleged victim[']s psychiatric files." The motion alleged that M.F. "has been in counseling and treatment at Mendota State Hospital." In support of the request for inspection, Darcy K. asserted:

(1) That the records contain evidence material to the defense in that;
 (a) we expect the evidence to show the alleged victim[']s prior contradictory statements;
 (b) the alleged victim's frequent hallucinations and retreats from reality;

644

(c) the alleged victim is one who thrives on attention and knows that alleging sexual assault is one way of obtaining such attention;

(d) the alleged victim's retreat from reality on the death of her pet animal;

(e) discrepancies regarding the facts of the alleged incident which would shed light on the alleged victim's credibility;

(f) material witnesses to the defense would be divulged;

(g) exculpatory statements made by the alleged victim.

At the hearing on Darcy K.'s motion, his counsel further explained the basis for the inspection request as follows:

> The basis for it is that the credibility of the witness and her ability to accurately recall what she alleged to have happened could be affected by whatever level of mental functioning she is at. We don't know what her diagnosis is. We do not know what illusions she may be suffering under and so on and so forth. We understands [sic] that we're not in a position to look directly at those records but in order to achieve justice for the client we do need to have somebody check to see that this is in fact a competent witness and we—without an in camera examination we don't know that. The last I heard she was at Mendota Mental Hospital in Madison and that surely has to send up at least some strong signal that perhaps she's not competent.

The State responded that Darcy K. had not made a sufficient preliminary showing for an in camera inspection of the records. In response to a question from the court, the prosecutor acknowledged that the district attorney's office had possession of some of M.F.'s psy-

chiatric and counseling records in files relating to juvenile and Chapter 51, STATS., proceedings involving M.F., but that "[w]e don't have any of the records from Mendota."[1]

The court took the motion under advisement and later issued a memorandum decision and order in which it noted that Darcy K.'s assertions were not supported by testimony or affidavits, but that the State had conceded that M.F. had been "counselled [sic] or treated for mental or emotional problems." Although the court concluded that Darcy K.'s "conclusory allegations are insufficient to establish that the complainant's otherwise confidential records will yield any evidence material to the defense," it ordered the State to submit for in camera inspection those records which were then in the State's possession.

Following its review of the records, the court issued a written order generally describing the nature of the records that were submitted and the specific matters which the court had looked for in the records, which essentially encompassed the assertions made in Darcy K.'s motion, as set forth above. The court noted that the records revealed that M.F. "consistently reports that the defendant began sexually abusing her at about age 6," and it disclosed excerpts from five different documents, identifying their dates and the names of the treatment professionals making the entries, as well as the specific statements M.F. made to them regarding sexual abuse by her stepfather. The court concluded that the records contained "no other information which should be disclosed to the defendant," and that he had "not met his burden to establish that additional records from Mendota Mental Health

---

[1] *See*, however, n.8, below.

Institute will disclose evidence material to his defense."

At a subsequent pre-trial proceeding, Darcy K.'s counsel asked the court to divulge M.F.'s "diagnosis," arguing that "if we knew what the diagnosis was, we'd be in a better position to evaluate the credibility of the witness as to her ability to accurately recall these events. If she's subject to hallucinations or delusions or whatever, I think we should be entitled to know that diagnosis." The court denied the request, explaining that "if she was subject to hallucinations and that sort of thing, I might agree that you're entitled to know that. I've ruled that you're not entitled to know it, which I would think would tend to suggest to you that she's not subject to hallucinations per the medical records."

Following the opening statements at trial, the court instructed the jury that it would permit jurors to propose questions of the witnesses after counsel had completed their examinations of each witness. Jurors were told to raise their hands if they had questions they would like to have a witness answer, and that they would then be called on to state their questions to the court. The court explained that it might rephrase a question before putting it to the witness, reject it entirely or confer with counsel regarding a particular question. M.F. was the first witness to be called by the State, and several jurors had questions they requested the court to ask her. Following the questions from jurors, Darcy K's counsel asked the court, "Can I ask a question in response?" The court responded that it did not "allow follow-up questions to juror questions." We discuss below, in our analysis of the ineffective assistance of counsel claim, specific juror questions and

comments cited by Darcy K. as being prejudicial to his defense.

The jury found Darcy K. guilty of all three sexual assaults. He filed a postconviction motion seeking relief grounded on the same claims he makes on this appeal. At the hearing on Darcy K.'s postconviction motion, the State explained that the psychiatric and counseling records which it had submitted for in camera review had come from three sources: (1) records in its files relating to proceedings involving M.F.'s need for protection and services (CHIPS); (2) records in its file regarding a mental commitment proceeding for M.F., which the district attorney had commenced; and (3) records obtained from "Psychiatric Associates" pursuant to a subpoena, which had apparently been authorized by the court, although it is not clear to which proceeding these records related.[2] The prosecutor also told the court "I do not have in my file any signed release from the victim in this case," and that "I know that we don't have a signed release from her indicating that we could provide those records to the Court."

Darcy K.'s trial counsel testified at the postconviction hearing regarding his failure to object to the juror questioning procedure or to any specific juror questions. Counsel stated that he did not object to the procedure itself because he anticipated that jurors would submit written questions and that the allowance of oral questions caught him by surprise. He testified that he did not object to specific questions because "for a practical and tactical point of view you're going to make an enemy of that juror, and that's the last thing you want." Counsel also testified that the follow-up

_____

[2] *See* n.8, below.

questions he wanted to ask M.F. would have explored an alleged inconsistency regarding prior incidents of sexual abuse in Illinois and whether M.F. was subject to hallucinations or daydreams. Finally, he explained that he did not request to ask follow-up questions after juror questions had been asked of subsequent witnesses because he "assumed the Judge was not going to permit them."

The trial court entered an order denying Darcy K.'s postconviction motion. He appeals that order and his judgment of conviction.

## ANALYSIS

*a. The Psychiatric and Counseling Records*

■

Darcy K.'s claims of error involve two sets of records, those that were in the State's possession which the court inspected, and the additional "Mendota records" which were not obtained by any party nor reviewed by the court. His argument with respect to the records that were inspected by the court is twofold: first, that it was error for the court to inspect those records without M.F.'s express, written consent; and second, that the court should have released more information from those records than it did. The State argues that Darcy K. is judicially estopped from raising the issue of M.F.'s lack of consent to the disclosure of her records because, with respect to this issue, he prevailed in the trial court and cannot challenge the trial court's favorable action taken on his own request. We agree. *See State v. Gove*, 148 Wis. 2d 936, 938, 437 N.W.2d 218, 218 (1989) (defendant who actively contributes to trial court action cannot claim the action was error on appeal).

In his reply brief, Darcy K. responds that he should not be estopped from raising the issue of M.F.'s lack of consent because he was actually seeking her records from Mendota Mental Health Institute, not the non-Mendota records that were given to the trial court.[3] The record, however, does not support this contention. Darcy K.'s motion requested an in camera review "of all the items of information located in the alleged victim[']s psychiatric files." While the motion cites M.F.'s treatment at Mendota as a basis for the motion, the request is not limited to records from that institution. At the hearing on his motion, Darcy K. did request that records from Mendota be obtained for review, but he did not specifically limit his request to those records. After the court entered its order disclosing portions of the records it had reviewed and declining to order the submission of additional records from Mendota, Darcy K. did not renew his request for additional Mendota records. Rather, he asked the court to divulge Darcy K.'s "diagnosis, not anything beyond that."

Darcy K. also argues that the State forfeited the right to raise an estoppel argument on appeal because it did not make the argument in the postconviction proceedings in the trial court. Darcy K.'s waiver argument relies on *State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577, 584 (1997), where the supreme court concluded that the State had waived the issue of whether a defendant had made a sufficient allegation in pleading a motion by its failure to raise the issue before the trial court. The court noted that the State's failure to raise the pleading issue in the trial court prevented the defendant from curing the omission and

---

[3] The records reviewed by the trial court *did* include two records from Mendota Mental Health Institute. *See* n.8, below.

prevented the trial court from considering the claimed defect. *Id.* Here, however, Darcy K. was given a full opportunity to make a factual record and to argue his postconviction motion to the trial court. There was nothing Darcy K. could have done during postconviction proceedings to alter the fact that the court's in camera review of M.F.'s psychiatric records had been conducted at his own request. We thus conclude he is not unfairly prejudiced by our consideration of the judicial estoppel issue and his waiver argument must fail. Rather, this case is governed by the rule that a respondent may advance for the first time on appeal any argument that will sustain the trial court's ruling.[4] *See State v. Holt*, 128 Wis. 2d 110, 124–25, 382 N.W.2d 679, 687 (Ct. App. 1985).

Even if we were to conclude that Darcy K. was not estopped from raising the issue of M.F.'s lack of consent to the disclosure of her records to the court, we would find little merit in his argument. Darcy K.'s motion for in camera inspection was granted only with respect to the records in the State's possession. Nonetheless, he claims that "the testimony of the complainant must be suppressed" because M.F. failed to give her consent to

[4] The State also argues that Darcy K. lacks standing to contest the in camera inspection on the basis of M.F.'s lack of consent to the disclosure of her psychiatric and counseling records to the court. *See State v. Echols*, 152 Wis. 2d 725, 736–38, 449 N.W.2d 320, 324 (Ct. App. 1989) (a criminal defendant, who is not authorized by statute or rule to claim privilege on a patient's behalf, may not object to admission of evidence contained in privileged communication between patient and psychologist). Since we conclude that Darcy K. is estopped from raising the issue in this court, we do not address the standing issue.

the disclosure of those records to the court, citing *State v. Shiffra,* 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993). Our holding in *Shiffra* is not germane here for two reasons: (1) in *Shiffra,* we specifically addressed only the circumstance where "the information sought by the defense is protected by statute *and is not in the possession of the state,*" *id.* at 606–07, 499 N.W.2d at 722 (emphasis added); and (2) we held in *Shiffra* that suppression of testimony is an appropriate sanction for a complainant's *refusal* to disclose records which had been shown to be material to the defense. *Id.* at 612, 499 N.W.2d at 724–25. While it is true that M.F. did not execute a written consent for the transfer to the court of the records in the State's files, she did not refuse to do so. No one asked her for her consent.[5]

We turn now to Darcy K.'s claim that the trial court disclosed too little information from the records it reviewed in camera. He argues that, provided we conclude we may do so, we should review the sealed records to determine if the trial court properly exercised its discretion in disclosing to the defense only those portions of the records which it did. The State counters that Darcy K. made an insufficient showing to obtain an in camera review of any of M.F.'s records, and thus Darcy K. received a "windfall" in getting the infor-

---

[5] Darcy K. also argues that, because M.F. "selectively disclosed" the psychiatric records to the State and withheld them from the defense, we should rule either that the whole of the records in the State's possession should have been disclosed to him, or that M.F. should not have been allowed to testify. Although the record is silent on the question, we presume that M.F. no more willfully disclosed the records in question to the State during the previous proceedings than she did to the trial court in this proceeding. The selective disclosure argument thus has no validity on the present facts.

mation he did from the records the trial court reviewed. Thus, according to the State, there is no need for us to independently review the records. Further, if we conclude Darcy K. made a proper showing under *Shiffra*, the State asks us to remand to obtain M.F.'s consent before we undertake our own review of the records.

While we affirm the trial court's actions in this case, we do not do so on the basis of the State's proffered analysis. As we have explained, *Shiffra* dealt with records *not* in the possession of the State. The records which the trial court ordered submitted for its in camera inspection were in the prosecutor's possession, largely as a consequence of previous court proceedings involving M.F. brought by the State and Vernon County under Chapters 48 and 51, STATS. The trial court expressly concluded that Darcy K. had made an insufficient preliminary showing under *Shiffra* to obtain any records. The trial court's in camera review was thus not conducted for the purpose of complying with the *Shiffra* mandate. Rather, the court's order for submission of the records possessed by the State was apparently based on an unarticulated premise that fairness required that the records be reviewed to ensure any information in them relevant to the instant prosecution be shared with the defendant.[6] *See Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) ("It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.").

---

[6] The trial court made it clear at the postconviction hearing that it would not have ordered the records in question to be submitted for its review if they had not already been in the State's possession.

■We conclude that the trial court properly ordered the State to submit the records in its possession relating to M.F. for in camera inspection.[7] Generally, when a defendant fails to make the preliminary showing required by *Shiffra*, neither the defendant nor the State gains access to any information from a complainant's psychiatric or counseling records. Here, however, the State had already acquired some of those records, and thus it had the benefit of whatever information from those files as might be relevant to the instant prosecution. Darcy K. is not M.F.'s parent, and he was not privy to the prior court proceedings involving her. He thus had no way to gain independent access to the information in the State's files. Given the nature of the records and the statutory protections afforded them under Chapters 48, 51 and 905, STATS., it was not improper for the trial court to order their submission for in camera review in lieu of granting Darcy K. broader or unlimited access to those records. The court properly undertook a screening function and disclosed to Darcy K. that information from the records which it

---

[7] Since there is nothing in this record to indicate otherwise, we must assume that the State had properly obtained those records. *See, e.g.,* § 48.293(2), STATS., 1993–94 (all records of a child relevant to Ch. 48 proceedings are open to inspection by counsel for any party and counsel may obtain copies of the child's records); § 51.30(4)(b)4, STATS., 1993–94 (mental health treatment records may be released without informed written consent pursuant to court order); and § 51.30(4)(b)14, STATS., 1993–94 (records related to persons who are "admitted, detained or committed" may be released to "counsel for the interests of the public" in Ch. 51 proceedings). Moreover, it appears that some of the records in question had been disclosed to the judge or judges presiding in the prior proceedings. *See* n.8, below.

deemed relevant to the criminal case, while preserving the confidentiality of the remainder of the records.

■

We must therefore determine whether the trial court erred in releasing only the information from M.F.'s records that it did. Since we have concluded it was proper for the trial court to review the records, we must also be able to inspect them in order to provide Darcy K. a meaningful appeal of the trial court's limited disclosure decision. *See State v. Solberg*, 211 Wis. 2d 372, 383, 564 N.W.2d 775, 780 (1997) ("If the circuit court had the authority to review the privileged records, then the court of appeals also had the authority to do so."). We review the trial court's decision regarding the withholding of information from records it has reviewed in camera "under the clearly erroneous standard." *Id.* at 385–86, 564 N.W.2d at 781. A circuit court properly exercises its discretion in this regard if it "applies the relevant law to the applicable facts and reaches a reasonable conclusion." *Id.* at 386, 564 N.W.2d at 781. We have reviewed the sealed records contained in the appellate record, and we conclude that the trial court did not erroneously exercise its discretion when it released to Darcy K. only the information it did.[8]

---

[8] A cover letter accompanying the records, written by the Vernon County Assistant District Attorney to the trial court, identifies three groups of records, two being those from "our juvenile file" and "our mental commitment file" as previously noted. The third group, however, is identified as being from "our criminal file," and consists of an admission summary, two evaluations and sixteen pages of progress notes from Psychiatric Associates of Southwest Wisconsin. These are apparently the items referred to at the postconviction hearing as being obtained by subpoena, apparently with the court's approval.

Finally, we consider whether the trial court erred in refusing to order the submission of additional treatment records from Mendota Mental Health Institute for in camera review. We agree with the trial court's assessment that neither Darcy K.'s unsworn assertions in support of his motion, nor the records reviewed in camera, provide a basis to order further disclosures of records relating to M.F.'s psychiatric treatment and counseling. "[A] defendant must establish more than 'the mere possibility' that psychiatric records 'may be helpful' in order to justify disclosure for an in camera inspection." *State v. Munoz*, 200 Wis. 2d 391, 397–98, 546 N.W.2d 570, 572–73 (Ct. App. 1996) (emphasis omitted). As we have discussed, Darcy K. established that M.F. had received psychiatric treatment between the time of the offenses and the trial. He offered little, if anything, however, beyond mere speculation that information from her treatment records would be relevant or helpful to his defense, or that the information was necessary to a fair determination of his guilt or innocence. *See Shiffra*, 175 Wis. 2d at 608, 499 N.W.2d at 723. Furthermore, Darcy K. did receive the benefit of

There is nothing in the appellate record which indicates the basis on which the State obtained these records, nor is there any objection or challenge by Darcy K. to the State's having obtained this third group of records.

Two of the records submitted from the juvenile file are from Mendota Mental Health Institute: a discharge planning conference summary prepared by a social worker, and a discharge summary and treatment recommendations from a physician. The items from the mental commitment file are the commitment order itself and two court-ordered evaluations, one by a psychiatrist and one by a psychologist, each addressed to the Vernon County Circuit Court.

an in camera review of at least some of M.F.'s records, including two records from Mendota Mental Health Institute (*see* n.8 above), during which the trial court stated it looked specifically for evidence of the matters Darcy K. alleged in his motion (e.g., possible hallucinations or delusions, separation from reality, exculpatory statements). The trial court found no evidence of these things in the sealed records, nor did we.

### b. *The Procedure for Juror Questioning*

Following the questioning of each witness by both counsel, and on occasion by the court, the trial court asked if any jurors had questions they would like put to the witness. The court called on jurors who raised their hands to state their questions. The court then restated the juror's question, declined to ask it of the witness, or on some occasions, asked for input from counsel. On several occasions, the court told jurors that they were making statements and should not be doing so. At no time did Darcy K.'s counsel object to either the procedure or to specific questions relayed from jurors. After juror questions had been put to the first witness, M.F., counsel requested permission to ask a follow-up question, but was denied the opportunity to do so. He made no offer of proof regarding the matter or matters he wished to explore, and he made no requests for follow-up questions with other witnesses.

█

Darcy K. claims that because of the procedure the trial court employed for juror questions, he was denied a fair trial. He argues that the procedure deprived him of a meaningful opportunity to object to questions, placed the jurors in an adversary role, allowed the admission of improper evidence, and deprived him of the opportunity to adequately defend himself by cur-

tailing cross-examination. The State contends, however, that Darcy K. forfeited the right to claim any trial court errors stemming from the juror questioning procedure employed at his trial because he failed to timely object to the procedure itself or to any specific juror questions. We agree. *State v. Waites*, 158 Wis. 2d 376, 390, 462 N.W.2d 206, 211–12 (1990).

Darcy K. argues that his failure to object should be excused because he did not have a realistic opportunity to do so and because the "failure to object was a product of the challenged procedure itself." In response, the State cites numerous methods and opportunities available to Darcy K.'s counsel to object outside of the jury's presence both to the oral questioning procedure and to specific juror questions. We concur with the State that the record does not support Darcy K.'s claim that it would have been impossible, or even difficult, for his trial counsel to object without running the risk of antagonizing jurors. Even if contemporaneous objections to certain juror questions or comments would have run that risk, nothing would have prevented defense counsel from objecting after the fact and seeking to have particular responses stricken or curative instructions given. Finally, we note that Darcy K.'s counsel himself referred to at least one response to a juror question in his closing argument, indicating that trial counsel may well have deemed the juror questioning helpful, or at least neutral, with respect to his client's interests.

The trial court denied defense counsel's request to ask a follow-up question of M.F. after she had responded to questions from several jurors. In response to juror questions, M.F. testified that she had not been involved in counseling prior to Darcy K.'s assaults but that she was so involved after the assaults. She also

testified that there had been "many" prior incidents in Illinois similar to the offenses charged.[9] At the postconviction hearing, counsel testified that if the court had permitted him to do so, he would have explored alleged inconsistencies regarding M.F.'s allegations of prior assaults by Darcy K. in Illinois, and that he would have followed up on the counseling inquiry with questions regarding M.F.'s possible delusions or hallucinations.

Darcy K. argues that the court's prohibition of follow-up questions after the juror questions deprived him of his constitutional rights to cross-examine witnesses and to present a defense. As with his claim of error regarding the questioning procedure itself, however, Darcy K. has forfeited his right to complain of the trial court's disallowance of further questioning of M.F. Section 901.03(1)(b), STATS., provides that "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless . . . the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." *Accord Milenkovic v. State*, 86 Wis. 2d 272, 284–85, 272 N.W.2d 320, 326 (Ct. App. 1978). Darcy K.'s counsel did not make an offer of proof as to what he wished to establish with follow-up questions, and "the substance of the evidence," as described by counsel at the postconviction hearing, was not apparent from the questions which had been put forward by jurors.

Darcy K.'s failure to object to the juror questioning procedure in general, or to any specific questions or responses, and his failure to make an offer of proof, deprived the trial court of the opportunity to abandon the practice, revise its procedures, or take other steps

---

[9] Darcy K., his wife and her children, including M.F., had moved from Illinois to Vernon County several months prior to the 1992 offenses.

to reduce the possibility of prejudice resulting from anything that occurred during juror questioning of witnesses. Any relief from Darcy K.'s conviction on account of the juror questioning as it was conducted during his trial, must therefore come, if at all, from his claim of ineffective assistance of counsel.

### c. *Ineffective Assistance of Counsel*

Anticipating the State's waiver argument, Darcy K. also argues that his trial counsel's failure to object to the juror questioning generally or to specific questions, as well as the failure to make an offer of proof regarding the denial of follow-up questions, constituted ineffective assistance of counsel. In order to prevail on his claim that trial counsel was ineffective, Darcy K. must show both that counsel's performance was deficient and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We defer to a trial court's factual findings regarding counsel's actions during trial court proceedings. *State v. Jones*, 181 Wis. 2d 194, 199, 510 N.W.2d 784, 786 (Ct. App. 1993). Whether counsel's performance was deficient, however, and, if so, whether that performance prejudiced the defense, are questions of law which we review de novo. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711, 715 (1985). Finally, since Darcy K. has the burden to show both deficient performance and prejudice, we will affirm the denial of postconviction relief if we conclude he has failed to meet his burden on either issue. *See Jones*, 181 Wis. 2d at 200, 510 N.W.2d at 786.

Review of the performance prong may be abandoned "[i]f it is easier to dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697. The burden is on Darcy K. under the prejudice test to show that the errors committed by counsel were so serious that they deprived him of a fair trial, that is, a trial whose result is reliable. *Id.* at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. We conclude that none of the failures cited by Darcy K., singly or cumulatively, establishes a reasonable probability that the result of his trial would have been different.

Darcy K. first asserts that we must presume prejudice from counsel's failures to object to the oral questioning by jurors and to make an offer of proof. In support, Darcy K. cites *State v. Smith*, 207 Wis. 2d 258, 279–82, 558 N.W.2d 379, 389–90 (1997), where the supreme court held that prejudice to a defendant may be presumed when trial counsel fails to object to the State's material and substantial breach of a plea agreement. The cases surveyed by the court in *Smith* indicate, however, that conclusions of "prejudice per se" usually follow a complete denial or absence of counsel at a critical stage of criminal proceedings, or result from some type of misconduct by the State. *Id.* Neither occurred in this case, and we thus conclude that we must analyze whether any of the cited failures of Darcy K.'s trial counsel undermine confidence in the guilty verdicts, given all of the facts and circumstances present at the trial. *Pitsch*, 124 Wis. 2d at 642, 369 N.W.2d at 719.

Darcy K. first cites the oral questioning procedure itself, irrespective of any specific questions, as denying him a fair trial because he was denied the opportunity

to object to questions outside the presence of the jury. We have stated our conclusion above that we may not simply presume prejudice on this record. Thus, absent a showing that prejudicial evidence was improperly admitted through the procedure, Darcy K.'s argument that he was prejudiced in general by the lack of an opportunity to object outside the jury's presence must also fail. We have noted that Darcy K.'s trial counsel cited a response to a juror's question in his closing argument that was beneficial to the defense. If all of the evidence admitted via questions from jurors was either benign or beneficial to Darcy K., he cannot claim to have been prejudiced by counsel's failure to object.

Next, Darcy K. claims that the oral questioning procedure permitted jurors to take on an adversary role and encouraged them to prematurely evaluate the evidence. In support, he cites a colloquy between a juror and the court where the juror stated his or her belief that M.F.'s eight-year-old sister, who was present in the room during one of the assaults, would have been able to help M.F. had she protested Darcy K.'s actions. The court told the juror that a question had not been stated, and that "I don't want you to make statements about what you think about the evidence at this point." Darcy K. claims this admonishment from the court may have signaled to the jury that the juror's evaluation of M.F.'s credibility was unimportant, and that it may have kept her from speaking up during deliberations. We agree with the State, however, that the juror's comments were, if anything, beneficial to the defense, and that the court's statement to the juror was little more than a reminder that jurors should not discuss the evidence until the case is submitted to them for deliberation.

Darcy K. also points to a juror's question which he contends allowed a State witness to change his testimony. M.F.'s adult brother testified that he had confronted Darcy K. with the accusation, "so you were touching [M.F.]," to which Darcy K. responded, "what are you going to do about it?" M.F.'s mother, who was present during this confrontation, had previously testified that Darcy K.'s response was "yeah, what are you going to do about it?" A juror wanted to know from M.F.'s brother "the exact words of [Darcy K.] when he was accused of messing with his sister." The witness responded:

> A He said ["]what are you going to do about it?["]
>
> A JUROR: Previously I think he said ["]yeah, what are you going to do about it?["]

> BY THE COURT:

> Q Okay, did you ever hear him say that?

> A He, you know, now that I think about it, you know, I'm not sure.

> Q Okay, could he have said "yeah, what are you going to do about it?"

> A Yeah, it's more likely, you know, I mean, it all happened so fast. When I heard that reaction, my question was pretty much answered and I was pretty set on what I was going to do.

Darcy K. argues that the distinction between the two accounts is critical and that allowing the witness to "to adapt testimony to accommodate a juror is obviously dangerous and unfair." We disagree with Darcy K.'s assessment. It is true that the juror was mistaken that M.F.'s brother had previously testified to the use of "yeah" at the beginning of the statement attributed to Darcy K. That had come from another witness. Even

without "yeah," however, the statement could be interpreted as an admission, or at least far from a denial, of the accusation. M.F.'s brother never unequivocally adopted "yeah" as part of Darcy K.'s statement, and he acknowledged that he was uncertain as to the exact words spoken. We conclude that Darcy K. was not prejudiced by this attempt to reconcile testimony from two witnesses, each of whom had given substantially similar accounts of the accusation and Darcy K.'s response.

After Darcy K. had testified, a juror wanted to ask him on which side of M.F. he had been seated during an assault which had occurred on a couch. Darcy K., however, had denied the incident had occurred. Darcy K. claims this was a "trick question" which undermined the fairness of the trial. The claim of prejudice might have merit if the court had allowed the question to be asked, but it did not. Rather, the court told the juror that Darcy K. had denied that incident. The court also gave Darcy K. the opportunity to testify again that he did not recall any incident where he and his stepdaughter "were sitting on a couch watching TV under a sheet." Accordingly, we find no prejudice from allowing Darcy K. to repeat his exculpatory testimony.

Darcy K. next argues that "prejudicial other crimes evidence" was admitted in response to a juror question. A juror wanted to know from M.F. "whether there was some prior incidents in Illinois?" She responded, "Yes, sir . . . [m]any, yes." Darcy K. claims that the unfair prejudice of this evidence substantially outweighed its probative value, and that he was therefore greatly prejudiced by his counsel's failure to object to the question or to request that the response be stricken. The State disagrees, arguing that had the objection been made, the trial court would have prop-

erly overruled it. *See State v. Conley,* 141 Wis. 2d 384, 399, 416 N.W.2d 69, 75 (Ct. App. 1987) (Wisconsin historically has allowed introduction of evidence of prior sexual acts by the accused with the victim), *vacated on other grounds sub nom. Conley v. Wisconsin,* 487 U.S. 1230 (1988); *see also Hendrickson v. State,* 61 Wis. 2d 275, 282, 212 N.W.2d 481, 484 (1973). We need not decide this question, however, because evidence of Darcy K.'s prior acts in Illinois had already been admitted during M.F.'s questioning by counsel, without objection from Darcy K.[10] We cannot conclude, therefore, that Darcy K. suffered any prejudice from counsel's failure to object to this question from a juror or to M.F.'s response.

Finally, Darcy K. claims prejudice from his trial counsel's failure to make an offer of proof when the court denied follow-up questioning of M.F., and in counsel's failure to renew his request for follow-up questions following juror questioning of other witnesses. We can only address the questions Darcy K. claims he should have been allowed to ask M.F., because the record is silent as to what questions Darcy K. might have put to other witnesses following juror questioning. As we have described above, trial counsel testified to two possible lines of inquiry, one regarding inconsistencies concerning M.F.'s allegations of prior incidents of sexual abuse occurring in Illinois, and the

---

[10] When asked by the prosecutor whether she had reported Darcy K.'s assaults to her mother, M. F. testified, "I had told my mother twice when we were living in Illinois and once when we were up in [Vernon County]." During cross-examination, Darcy K.'s counsel sought to establish inconsistencies in the number of assaults M.F. had related to authorities, and M.F. responded, "Well, only four had happened in Wisconsin."

other regarding whether M.F. suffered from hallucinations or engaged in "day-dreams."[11]

The trial court took a dim view of trial counsel's testimony at the postconviction hearing, stating "I don't think for a minute that he had any pressing questions that needed to be asked of [M.F.]." We accept the trial court's assessment. Nothing would have prevented Darcy K.'s counsel from pursuing both matters during his initial cross-examination of M.F. She had referred to the Illinois incidents in her direct testimony, and during cross-examination defense counsel consciously attempted to exploit inconsistencies in M.F.'s prior statements. If, as he testified at the postconviction hearing, counsel "could pretty well establish [that what was alleged in Illinois] did not happen," he could have confronted M.F. regarding the matter during his cross-examination, as he did with other inconsistencies in her statements. Also, if counsel had evidence of M.F.'s hallucinations or detachment from reality, these would have been proper matters with which to undermine M.F.'s credibility during cross-examination. There was no need to withhold either line of questioning until after M.F. had responded to jurors' questions.

At the postconviction hearing, Darcy K. produced none of the evidence he purportedly had that would have necessitated favorable responses from M.F. to the unasked questions. We thus conclude from the record before us that defense counsel's failure to inquire into these two matters during the trial was likely based on a lack of evidence to support the inquiries, or on a tactical decision to forego them for fear that M.F.'s responses would be more harmful than helpful to the

---

[11] We note, however, that counsel's request to the court at trial was, "Can I ask *a question* in response?" (Emphasis added.)

defense. Under either circumstance, failure to ask the questions may not have constituted deficient performance. In any event, the record provides no basis for us to conclude that counsel's failure to make an offer of proof following the denial of his request to ask a follow-up question, undermines confidence in the outcome of the trial.

### d. New Trial in the Interests of Justice

This court may exercise its discretion to reverse Darcy K.'s convictions if we conclude that either (1) the real controversy has not been tried, or (2) that it is probable that justice has miscarried. Section 752.35, STATS. Darcy K. argues that both circumstances are present here. Under the former, he must convince us that the jury was precluded from considering "important testimony that bore on an important issue" or that certain evidence which was improperly received "clouded a crucial issue" in the case. *State v. Hicks*, 202 Wis. 2d 150, 160, 549 N.W.2d 435, 439–40 (1996). To prevail on his request grounded on a miscarriage of justice, Darcy K. must convince us "there is a 'substantial degree of probability that a new trial would produce a different result.'" *State v. Caban*, 210 Wis. 2d 598, 611, 563 N.W.2d 501, 507 (1997) (alteration omitted) (quoting *State v. Wyss*, 124 Wis. 2d 681, 734, 370 N.W.2d 745, 770 (1985), *overruled on other grounds, State v. Poellinger*, 153 Wis. 2d 493, 506, 451 N.W.2d 752, 757 (1990)).

As we have discussed above, we conclude with respect to all issues Darcy K. has raised in this appeal, either there was no error or he suffered no prejudice. In analyzing whether Darcy K. suffered prejudice from his trial counsel's omissions regarding the juror ques-

667

tioning procedure, we specifically considered whether there was a reasonable probability that the outcome of the trial would have been different had timely objections or an offer of proof been made. We concluded there was not. Accordingly, we find no reason to exercise our discretionary authority under § 752.35, STATS., to grant Darcy K. a new trial.

## CONCLUSION

For the reasons discussed above, we affirm the judgment of conviction and the order denying postconviction relief. We have concluded that Darcy K. forfeited the opportunity to claim trial court error in the juror questioning procedure employed at his trial, and further that he suffered no prejudice from the specific deficiencies in the procedure which he cited to us. Nonetheless, we also conclude that this record demonstrates many of the potential risks inherent in permitting jurors to pose questions orally and in allowing them to engage in open dialogue with the court during a criminal trial. Many of the potential problems stemming from juror questioning can be avoided or minimized if proper procedural safeguards are employed by the trial court.

We therefore agree with the parties to this appeal[12] that when a trial court chooses to permit

---

[12] Darcy K. argued on this appeal that this court should declare juror questioning of witnesses to be impermissible in criminal trials, or in the alternative, we should hold that when a trial court permits jurors to submit questions for witnesses, the court must employ the safeguards spelled out in WIS J I—CRIMINAL SM–8. The State responded that this court should not prohibit juror questioning in criminal trials because it is permitted in the vast majority of jurisdictions that have consid-

jurors to submit questions for witnesses during a criminal trial, in order to avoid the potential for prejudice to either the State or the defendant, a trial court should employ the safeguards recommended by the Criminal Jury Instructions Committee, which are as follows:[13]

> If a trial court decides to allow juror questions, notice should be given to counsel. If counsel objects, proceeding with juror questions should be supported by findings on the record.

### III. Recommended Procedures if Questions are Allowed

There appears to be consensus on the basic procedures to be followed if juror questions are allowed. The major aspects are as follows:

A. Whether to allow questions lies within the judge's discretion.

---

ered the issue. (As of 1991, some twenty-two states and six federal circuits expressly permitted the practice by statute or case law, while only two states specifically prohibited juror questioning in criminal cases. WIS J I—CRIMINAL SM–8 at 1–2.) The State, however, concurred in Darcy K.'s suggestion that the "SM–8" procedures be established as the norm for trial courts that wish to permit jurors to submit questions of witnesses in criminal trials. (To be precise, the State first argued that, in deciding this case, we need not reach the issues of banning juror questioning in criminal cases or prescribing procedures to be followed by courts that wish to allow it. The State went on, however, to state that "[i]f this court believes otherwise," we "should adopt the procedures recommended by WIS J I—CRIMINAL SM–8; which includes safeguards which were missing from the procedure utilized by the circuit court in the present case.")

[13] Section 752.02, STATS., provides that this court "has supervisory authority over all actions and proceedings in all courts except the supreme court."

B. Jurors should be given preliminary instructions advising them of the right to ask questions and explaining the procedure to be used.

C. After a witness is interrogated by counsel, but before the witness leaves the stand, the jurors are asked if they have any questions.

D. Questions are submitted in writing to the judge and are shown to the lawyers, who may object without the jury knowing of it.

E. The judge reviews the questions and any objections.

F. If the judge sustains the objection, the jury is advised that questions cannot be asked.

G. If the judge overrules the objection, the judge asks the question.

H. Lawyers are allowed to follow up on issues raised by juror questions.

## IV. Jury Instructions

If the jury is to be allowed to ask questions, a preliminary instruction telling the jury about the procedure ought to be given. Thus, the content of the instruction is dependent upon the type of procedure that is adopted. The following instruction is based on the procedure outlined above:

"You will be given the opportunity to ask written questions of any of the witnesses called to testify in this case. You are not encouraged to ask large numbers of questions because that is the primary responsibility of counsel. Questions may be asked only in the following manner.

"After both lawyers have finished questioning a witness and only at this time, if there are additional questions you would like to ask the witness, you may then seek permission to ask that witness a written question. Should you desire to ask a ques-

tion, simply raise your hand and the bailiff will furnish you with a pencil and paper. Questions must be directed to the witness and not to the lawyers or the judge. After consulting with counsel, I will determine if your question is legally proper. If I determine that your question may properly be asked, I will ask it. No adverse inference should be drawn if the court does not allow a particular question to be asked."

WIS J I—CRIMINAL SM–8 at 3–4 (footnotes omitted).

*By the Court.*—Judgment and order affirmed.